# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **TO BE FILED UNDER SEAL** |
| v. | : Hon. Leda Dunn Wettre |
| EDUARD SHTINDLER | : Mag. No. 19-8271 |
| | : **CRIMINAL COMPLAINT** |

I, Brett A. Fritzsch, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Brett A. Fritzsch, Special Agent
Federal Bureau of Investigation

August 29, 2019, at
Newark, New Jersey

HONORABLE LEDA DUNN WETTRE        _____
UNITED STATES MAGISTRATE JUDGE     Signature of Judicial Officer

<u>**ATTACHMENT A**</u>

<u>**COUNT ONE**</u>
**(Conspiracy to Commit Health Care Fraud)**

From at least as early as in or around 2015 through in or around January 2017, in Hudson County, in the District of New Jersey, and elsewhere, defendant

**EDUARD SHTINDLER**

knowingly and intentionally conspired and agreed with others to execute a scheme and artifice to defraud the Medicare program, a health care benefit program as defined under Title 18, United States Code, Section 24(b), and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, contrary to Title 18, United States Code, Section 1347.

In violation of Title 18, United States Code, Section 1349.

1

## COUNT TWO
### (Conspiracy to Pay and Receive Illegal Remunerations contrary to the federal Anti-Kickback Statute)

From in or around 2012 through at least in or around January 2017, in Hudson County, in the District of New Jersey and elsewhere, defendant

## EDUARD SHTINDLER

did knowingly and willfully conspire and agree with others to commit certain offenses against the United States, that is, to knowingly and willfully pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, in exchange for the furnishing and arranging for the furnishing of items and services, namely, the referral of prescriptions for patients to Empire Pharmacy, located in West New York, New Jersey, for which payment was made in whole or in part under a Federal health care program, namely, Medicare and Medicaid, contrary to Title 42, United States Code, Section 1320a-7b(b)(2).

In violation of Title 18, United States Code, Section 371.

## ATTACHMENT B

I, Brett A. Fritzsch, a Special Agent with the Federal Bureau of Investigation ("FBI"), having conducted an investigation and having discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all dates described in this affidavit are approximate and all conversations and statements described in this affidavit are related in substance and in part.

### Relevant Individuals and Background Information

1. At various times relevant to this Criminal Complaint:

    a. Defendant EDUARD "EDDY" SHTINDLER ("**SHTINDLER**") was the President and Owner of Empire Pharmacy, located in West New York, New Jersey ("Empire").

    b. Empire was a pharmacy that, among other things, prepared and supplied expensive prescription medications used to treat a variety of conditions, including Hepatitis C, Crohn's disease, and psoriatic arthritis.

    c. "Individual-1" was a pharmacist at Empire.

    d. "Individual-2" was a pharmacist at Empire.

    e. "Individual-3" was employed by Empire as a sales representative.

    f. "Doctor-1" was a psychiatrist with an office in Hudson County, New Jersey.

    g. Harvoni and Sovaldi were medications prescribed to treat Hepatitis C. Enbrel, Humira, and Otezla were medications prescribed to treat plaque psoriasis or psoriatic arthritis.

    h. The Medicare Program ("Medicare") is a federal program that provides free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. Medicare is a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f) and a "health care benefit program" as defined in Title 18, United States Code, Section 24(b). Individuals who receive benefits under Medicare are commonly referred to as "beneficiaries." Medicare has an optional Part D program, which, for a monthly premium, provides coverage for the cost of prescription drugs for people on

3

Medicare. This coverage is provided by insurance companies and other private companies approved by Medicare.

        i.      Medicaid is a program jointly funded by the federal government and individual states to assist poor persons and other qualified persons in paying for the costs of health care. Medicaid works by reimbursing hospitals, physicians and other health care suppliers, such as pharmacies, for providing health care services and items to qualified individuals at fixed rates in a manner similar to Medicare.

        j.      "Prior authorization" was a process that Medicare, Medicaid, and some private insurance providers required before agreeing to reimburse pharmacies for the cost of certain prescription medications. The process for obtaining prior authorization varied, but typically involved the completion of a prior authorization form containing information about, among other things, a patient's medical history, lab results, and previous treatments that were attempted and failed. Once submitted, a prior authorization request was approved or rejected. Rejections were common, but could be appealed. In some cases, it could take up to 30 days to obtain prior authorization.

        k.     "Step therapy" was a process sometimes required in order to obtain prior authorization for certain medications. Step therapy dictated that a patient first had to try and receive unsuccessful results from one or more medications before Medicare, Medicaid, or a private insurance carrier would grant prior authorization to reimburse the cost of a different medication.

### The Health Care Fraud Conspiracy

2. Prior to 2015, Empire was a retail pharmacy that occasionally filled prescriptions that required prior authorization. When such prescriptions were submitted to Empire, **SHTINDLER** handled all of the prior authorization forms himself.

3. Then, in or around 2015, Empire began filling a higher volume of specialty medications that required prior authorization. According to Individual-1 and Individual-2, **SHTINDLER** intended to entice doctors to use Empire for specialty medication prescriptions by showing that, among other things, Empire received prior authorization approval more successfully than any other pharmacies. To accomplish that goal, **SHTINDLER** directed Empire employees, including Individual-1 and Individual-2, to falsify prior authorization forms so that Empire would obtain approvals for prescriptions that would have otherwise been rejected. This fraudulent practice also enabled Empire to receive reimbursement payments that it otherwise would not have received.

4. The nature of the falsified information that Empire included on prior authorization forms varied depending on the patient and the prescribed

4

medication. For example, before reimbursing a pharmacy for an Otezla prescription, Medicare and Medicaid, among other insurance providers, required proof of prior step therapy showing that the patient had previously tried and received unsuccessful results from Enbrel or Humira. If a patient's medical file did not indicate that such step therapy had occurred, **SHTINDLER** directed Empire employees to lie on prior authorization forms by falsely stating that the patient had previously undergone such step therapy. By falsifying this information, Empire fraudulently received payments for Otezla prescriptions that it otherwise would not have received.

5. **SHTINDLER** also directed Empire employees to regularly falsify prior authorization forms for Hepatitis C medications, including Harvoni and Sovaldi. For Hepatitis C patients, a "fibrosis score" measured the level of scarring to the patient's liver caused by the Hepatitis C disease. Such scores ranged from "F0" through "F4," with an F4 indicating the most severe liver damage. Before in or around July 2016, Medicaid reimbursed pharmacies for the cost of Harvoni or Sovaldi only if a patient's fibrosis score was an F3 or above. On multiple occasions, at **SHTINDLER**'s direction, Invidiual-1 and other Empire employees falsified prior authorization forms for Medicaid patients who had fibrosis scores below an F3 by falsely indicating that the patients' fibrosis score was an F3 or above. Law enforcement has confirmed this practice by comparing true and accurate fibrosis scores contained in patients' medical files with falsified fibrosis scores submitted by Empire on prior authorization forms. By falsifying this information, Empire fraudulently received payments for prescription medication that it otherwise would not have received.

6. In several recorded conversations, **SHTINDLER** spoke openly about his practice at Empire of falsifying prior authorizations. For example, on or about May 4, 2017, **SHTINDLER** met with Individual-3, who had quit his job at Empire earlier that year out of concerns that Empire was committing fraud. In a recorded conversation on that date, **SHTINDLER** attempted to convince Individual-3 to return to Empire by, among other things, claiming that Empire was no longer engaged in fraud. During that conversation, **SHTINDLER** was captured admitting how he had previously falsified step therapy information, stating that he would "lie" about medications that patients "tried." During the same conversation, **SHTINDLER** was also captured discussing Empire's practice of falsifying fibrosis scores, stating that what set Empire apart from other pharmacies was its ability to get every Hepatitis C prescription approved, even for patients with "F0s."

7. In total, over the course of the charged conspiracy, Empire dispensed over approximately $2,000,000 in medications that resulted from Empire's practice of falsifying prior authorizations.

### The Illegal Kickback Conspiracy

8.  From in or around 2012 through in or around January 2017, **SHTINDLER** paid bribes to Doctor-1 to induce Doctor-1 to send prescriptions to Empire. Indeed, according to Individual-3, **SHTINDLER** admitted several times to paying bribes to Doctor-1 in exchange for prescriptions.

9.  Over the course of the conspiracy, **SHTINDLER** occasionally instructed Empire employees to deliver bribe payments to Doctor-1 on **SHTINDLER**'s behalf. For example, in or around the summer of 2016, **SHTINDLER** gave Individual-3 a sealed bag containing a cash bribe and instructed Individual-3 to hand-deliver the bribe payment to Doctor-1.

10. In addition, during the conspiracy, **SHTINDLER** took steps to conceal his bribe payments to Doctor-1. For example, on multiple occasions, while working at Empire, Individual-1 observed SHTINDLER stuff cash, sometimes in $100 denominations, into a pill bottle that had a label with Doctor-1's name on it, making it look like the bottle contained medication for Doctor-1. On at least one of those occasions, **SHTINDLER** then took the bottle and stated that he was going to visit Doctor-1.

11. In exchange for these bribe payments, Doctor-1 steered patients to bring their prescriptions to Empire. For example, law enforcement agents spoke with four of Doctor-1's patients who confirmed that Doctor-1 told them to use Empire as their pharmacy. All of those patients confirmed that, for all other prescriptions, they used different pharmacies closer to their homes, but they used Empire for their medications prescribed by Doctor-1 because he told them to do so.

12. On or about May 4, 2017, in the same recorded conversation noted above in paragraph 6, Individual-3 expressed concerns to **SHTINDLER** about getting in trouble for having delivered a bribe payment to Doctor-1 on **SHTINDLER**'s behalf. **SHTINDLER** responded, "You think [Doctor-1]'s going to go to the FBI and rat himself out?"

13. On or about May 18, 2017, in another recorded conversation between Individual-3 and **SHTINDLER**, **SHTINDLER** was again captured discussing his kickback arrangement with Doctor-1. Individual-3 repeated his concerns about getting in trouble because of the bribe payment he made to Doctor-1 on **SHTINDLER**'s behalf, stating, "Put yourself in my shoes, when I know you [**SHTINDLER**] made me do it." **SHTINDLER** responded, "First off, I didn't make you do it. I didn't put a gun to your head. We all made money together. Don't be a dick. Don't ever say that. What was done is done. It is business."

14. In total, over the course of the charged conspiracy, Empire dispensed over approximately $3,000,000 in medications prescribed by Doctor-1.